Filed 5/23/14  Turner, Warren, Hwang & Conrad v. Caicos Development Co. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TURNER, WARREN, HWANG & CONRAD ACCOUNTANCY CORP., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CAICOS DEVELOPMENT CO. et al., <br><br> Defendants and Respondents. | B246533 <br><br> (Los Angeles County <br> Super. Ct. No. EC054832) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David S. Milton, Judge.  Affirmed.

The Jamison Law Firm and Guy E. Jamison, for Plaintiff and Appellant.

Jerome D. Stark for Defendants and Respondents.

\* \* \* \* \* \*

Turner, Warren, Hwang and Conrad Accountancy Corporation ("appellant") appeals from a judgment after a jury rendered a verdict in favor of Caicos Development Company, Inc. et al. ("respondents") on a complaint for unpaid invoices for accounting services. Appellant claims the trial court committed prejudicial error by admitting irrelevant expert evidence. Appellant also claims it was deprived of a fair trial because of judicial bias. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Appellant is an accounting firm established in 1967 by Gary Turner. Respondents are eight corporate defendants and three individual defendants who received accounting services from appellant over a period of approximately 30 years. The individual defendants were: Jeffrey Wayne Stickler, who was the president and primary shareholder of the eight corporate defendants, and his wife, Michele Bowers-Stickler, and daughter, Ashley Stickler. The eight corporate defendants were: Jeffrey Wayne Stickler, Inc., Caicos Development Company, Inc., Catalina Adventure Tours, Inc., Catalina Glassbottom Boat, Inc., Island Enterprises, Inc., Island Navigation Co., Inc., Shoreco, Inc., and West Coast Navigation, Inc. The controversy in this case concerns unpaid invoices from January 2007 through the end of 2009.

On September 30, 2010, one of appellant's partners, Judy Warren, sent an e-mail concerning the outstanding invoices to respondents. The e-mail stated: "Dear Michelle and Jeff, please give me a call. I'm in the office today Thursday and tomorrow Friday except lunch time. I want to work out a resolution to the outstanding invoices. Soon I will be fully retired. If we don't work out an acceptable resolution today or tomorrow, the partners will proceed with other collections efforts. As you can see from the description below, the invoices include 2008 processing and 2008 tax returns. If we can't reach a resolution today or tomorrow, we may be forced to notify the IRS and the FTB that we were not paid as preparers on the returns since we were not paid. I await your call. Judy."

On December 27, 2010, appellant filed a complaint to recover fees for accounting services. The complaint contained claims for: breach of contract; open book; quantum

2

meruit; and account stated for accounting services from January 2007 through the end of 2009.  Respondents answered the complaint and cross-complained against appellant.[1]

**Respondents' Designated Expert Deposition Testimony**

On October 17, 2012, respondents' designated expert, Mark Wille, Certified Public Accountant, testified that he would not render any opinions at trial regarding the reasonableness of appellant's invoices and billings.  Wille testified that he believed appellant's threats to go to federal and state taxing authorities was a violation of a code of professional conduct if it in fact happened.  He could not state emphatically the threat violated any code of conduct but it made him "very uncomfortable."  Wille also testified that appellant's engagement letter failed to include a sentence required by American Institute of Certified Public Accountants ("AICPA") standards.  The sentence states "we are not independent with respect to this client."  He testified that the failure to include the sentence was an "omission as opposed to commission."  Wille also testified that appellant should be paid for the tax return services, which had nothing to do with the missing sentence.

Respondents' designated expert, Certified Public Accountant Kevin McKinney, testified on November 6, 2012.  McKinney testified that he was not retained as an expert to render an opinion at trial.  Respondents' counsel described McKinney as a "paid for witness" that counsel intended to call as a "percipient witness on privilege."  On November 1, 2012, respondents advised appellant by letter that McKinney "[would] not be testifying as an expert in this matter."  Instead, respondents intended to call him as "a percipient witness regarding his personal knowledge of the events surrounding his first-hand review of approximately five thousand (5,000) documents produced by [appellant] in this action and his determination, based on his experience, as to what the documents indicate as they pertain to [appellant's] rendering of accounting services to [respondents], and the amounts charged for the services."

---

[1]    The cross-complaint was dismissed before the jury rendered its verdict.

**Appellant's In Limine Motions**

On November 9, 2012, appellant filed two ex parte motions in limine. Motion in limine No. 1 sought to exclude Wille from testifying about the reasonableness of the disputed invoices because he testified that he would not be providing any such opinion. Appellant's motion in limine No. 2 sought to exclude McKinney from offering any testimony regarding the reasonableness or value of the accounting services covered by the invoices. Appellant also sought to exclude McKinney from testifying as a "percipient witness" of his observations of the invoices.

The jury trial began on November 13, 2012. Appellant filed two motions in limine on November 15, 2012. Motion in limine No. 3 sought to exclude Wille from testifying that appellant violated the AICPA governing certified public accountant standards by failing to include the required sentence in its engagement letters. Appellant argued his testimony regarding appellant's failure to include the sentence in the engagement letters would be unduly prejudicial and confuse the jury because Wille testified at his deposition that the failure to include the sentence was an "omission as opposed to commission" and that appellant should be paid for the tax return services which had nothing to do with the sentence.

Appellant's motion in limine No. 4 sought to exclude expert testimony from Wille that appellant acted unethically when Warren threatened in an e-mail to communicate to the IRS and FTB that respondents had not paid appellant to prepare the returns. Appellant asserted the opinion should be excluded because appellant denied that any communication took place and Wille testified that he could not opine that the threat was a violation of the code of conduct, but he was "very uncomfortable" that the threat was made. Appellant argued Wille's expert opinion on this issue would cause undue prejudice and confuse the jury.

In denying the motion in limine, the trial court stated that Warren's letter was "extortion against [respondents] which is illegal, unethical, and in violation of criminal law programs." Respondent's counsel argued the information was confidential and could

not be disclosed to the IRS or the FTB. The trial court agreed and stated that there was an accountant/client "privilege" not to disclose such information.

**Trial Evidence**

At the trial, appellant introduced evidence that respondents owed appellant $100,800 for unpaid invoices and for financial and tax services provided to respondents. The unpaid invoices were for the period from January 2007 through the end of 2009.

In the late 1970s, Turner began providing accounting services to Stickler and his eight corporations. Turner's accounting business, which had begun with one other employee, had 40 employees by November 2012. In 1987, Turner partnered with Warren and formed Turner, Warren an accounting corporation. Turner and Warren worked together doing all of respondents' accounting services including accounting, taxes, payroll tax returns, sales tax returns and annual public utilities commission reports. Warren was responsible for reviewing respondents' financial statements and supervising accounting work. He also handled the billing process for the work being done for respondents. Appellant performed the accounting services for respondents each year pursuant to a "Tax Engagement Letter" and written contracts for accounting services. The engagement letters provided that appellant would bill for services at its standard hourly rate. Stickler signed and returned the engagement letters for each year. Although Stickler did not return the engagement letters for 2009 and 2010, appellant continued to do the work for respondents because of the longtime business relationship.

After Turner died in 2008, the accounting/client relationship began to deteriorate as the accounting fees continued to rise and respondents stopped paying invoices. Warren was scheduled to retire at the end of 2008; however, she stayed on for an additional year. Warren did the billing for respondents during the time she stayed on with appellant. In 2010, Warren retired and moved to Colorado. Even though other people worked on the accounting and tax returns, she was responsible for the work and signed everything. Warren testified that the invoices increased because respondents had a lot of bookkeeping problems. Respondents had new bookkeepers, who double reported sales, and dropped or duplicated payroll entries. Appellant had to check and reconcile

5

many things to try to make sure the financial statements were accurate. There were times when the work did not always coincide with the same work coming in such as a corporation not filing a tax return in a given year. The work would be caught up after respondents gave appellant the information. There were eight corporations with interrelated inter-company transactions.

On cross-examination, Warren testified that appellant's "goal was to have as many billable hours" as possible. But, staff was encouraged to have efficient billable hours not just to make up time to bill clients.

Appellant called McKinney to testify under Evidence Code section 776. McKinney currently performed accounting services for respondents. He testified that he was not hired as an expert. After examining reviewing work and billings for this case, he had not formed an "opinion" but had reached "conclusions." He could not offer a rational explanation to respondents about why the fees increased.

Stickler testified that Turner was his accountant for approximately 35 years. Sometime around 2005, Stickler was concerned because he was not getting his financial statements in a timely fashion. Stickler was also trying to reduce his accounting fees. Turner suggested the bill might be decreased but it required the creation of three new corporations. Island Enterprises was formed to consolidate all of his companies for payroll and operating reasons. According to appellant, Island Enterprises was formed for legal liability purposes, not to save in accounting fees.

Bowers-Stickler, who was respondents' bookkeeper, testified that the three new corporations were formed to streamline lease payments and to put everything into one company, Island Enterprises. This company would lease and pay rent to the other companies. The corporation was also formed for liability reasons and to reduce accounting fees. Prior to the formation of Island Enterprises, they had three separate payrolls, one each in Catalina Adventure Tours, Catalina Glass Bottom Boat and Island Enterprises. They had employees separated into each of the companies and had expenses in each of the companies.

6

Respondents' total revenue went from $2,559,760 in 2005 to $3,963,120.96 in 2009. The total amount of invoices from appellant in 2005 was $32,380. In 2006, the invoices were $32,495. The records showed that the total amount of hours worked by appellant's staff were 364 when respondents had five corporations. In 2007, the fees went up to $34,780 and the total hours worked by appellant's staff were 393 when all eight corporations were in existence.

As previously noted, Turner died in 2008. Also in 2008, Tamara Garcia, who primarily handled respondents' accounting services, left appellant's firm. The invoices increased to $71,294.65 in 2008 and the total hours worked by appellant's staff were 1,073.9. In 2009, the fees increased to $94,830.45 and the total hours worked by appellant's staff were 936.8. One of appellant's employees, Jose Barron, was listed in the 2008 and 2009 invoices although he had not been listed in prior years as performing any accounting services for respondents. Barron billed 520 hours in 2008 and 505.6 hours in 2009.

Stickler also testified that the invoices for the individual companies varied substantially between 2005 and 2009. For example, for Shoreco appellant billed: $4,255 in 2005; $3,880 in 2006, $3,510 in 2007; $7865 in 2008; and $19,440.45 in 2009. According to Stickler, the billing should not have doubled between the years 2007 and 2008 because respondents were doing things exactly as they always did. Nothing changed in the operation of Shoreco that would have made the bill go from $7865 to $19,440.45 in one year.

Similarly, the invoices reflected substantial increases in the accounting fees for Island Enterprises over the applicable period as follows: $4,885 in 2006; $14,610 in 2007; $31,849.65 in 2008; and $44,770 in 2009. Stickler testified that the increase between the years 2006 and 2007 could be explained because of the merger of all the companies. However, he had no explanation of the subsequent increases because Island Enterprise had the same employees and the company was being operated in the same manner it had been in the past.

7

In 2009, respondents paid appellant $53,845 because there were open invoices from 2008. Respondents paid what they had previously paid and what they had budgeted for accounting services.

Bowers-Stickler testified that in one year appellant charged $200 for a State Board of Equalization report and then charged $2,000 for the same report the next year. After examining the invoices, it seemed as though appellant was having supervisors correct the work of subordinates. Appellant was also charging for work that respondents had not approved such as doing analyses of summaries of sales tax reports. Respondents had authorized appellant to prepare financial statements not perform analyses.

McKinney began doing accounting services for respondents in 2009. His bills totaled about $12,000 for 2010 and 2011.

Respondents called Wille as an expert. He explained that the AICPA is a professional organization that conducts peer reviews. The AICPA has promulgated standards which govern CPAs. The standards are set forth in the California Business and Professions Code. AICPA developed Statements on Standards for Auditing and Review Services ("SSARS"). In Wille's opinion, there were deficiencies in the financial statements prepared by appellant. Appellant did not include the financial "independent" statement in the reports, which made the reports "substandard" from a peer review standard. Anytime a CPA firm has fees that are owed for longer than a year, the firm is not independent. He opined that, if appellant contacted the IRS or FTB after Warren's e-mail, it was a clear violation of professional and confidentiality standards. He did not think that making a threat was a violation of any rule but most CPAs would not engage in such conduct. The IRS audited Island Enterprises in 2009 and 2010, but both audits resulted in no changes.

In rebuttal, appellant's expert, Certified Public Accountant, Charles Stanislawski, testified that in his opinion the invoices showed that the fees were reasonable. Stanislawski disagreed with Wille that the absence of language of the financial statements that appellant was independent was significant.

8

The jury reached an 11-to-1 verdict in favor of respondents that appellant was entitled to zero dollars ($0.00) on each of its claims. On January 15, 2013, plaintiff filed a notice of appeal prior to the trial court's entry of a judgment on the verdict on February 7, 2013. We deem the premature notice of appeal to be a timely appeal from the judgment. (Cal. Rules of Court, rule 8.104(d).)

## DISCUSSION

Appellant claims the trial court committed reversible error by denying the motions in limine which would have precluded expert opinion about Warren's e-mail and the AICPA violations. We review evidentiary rulings, including those made in limine, for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196 (*Williams*); *Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1480-1481.) A trial court has broad discretion in ruling on the admissibility of evidence. (Evid. Code, § 352; *Williams*, *supra*, 16 Cal.4th at p. 196.) An abuse of discretion is established only where there is a clear showing the determination exceeded the bounds of reason under all the circumstances. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

However, even when the trial court has abused its discretion, appellant must demonstrate reversible error by showing a miscarriage of justice. (Cal. Const., art. VI, § 13[2]; Evid. Code, § 353[3]; *People v. Earp* (1999) 20 Cal.4th 826, 880 (*Earp*).) A

---

[2] Article VI, section 13 of the California Constitution provides in this regard: "No judgment shall be set aside, or new trial granted, in any cause on the ground of . . . the improper admission . . . of evidence, . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

[3] Evidence Code section 353 states: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice."

"miscarriage of justice" means it is reasonably probable that the jury would have reached a result more favorable to the appealing party in the absence of error.  (*Earp*, *supra*, 20 Cal.4th at p. 880; *People* v. *Watson* (1956) 46 Cal.2d 818, 836.)

Appellant asserts that the expert opinion should have been excluded under Evidence Code section 352 because neither the e-mail nor AICPA violations were relevant to the reasonableness of its accounting services.  In addition, it argues the expert opinion had no probative value, and prejudiced, confused and mislead the jury.  Evidence Code section  352, subdivision (b) provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Evidence Code section 352 is designed to address evidence which tends to evoke an emotional bias against a party and which has very little probative value on the issues.  (*People v. Wright* (1985) 39 Cal.3d 576, 585.)  For example, "'evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  We agree with appellant that neither the e-mail nor the AICPA standards were relevant to the issue of whether the accounting services were reasonable.

However, after examining the entire cause, we cannot conclude that there has been a miscarriage of justice requiring the verdict to be set aside within the meaning of California Constitution, article VI, section 13 and Evidence Code section 353.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 174; *O'Hearn v. Hillcrest Gym & Fitness Center, Inc.* (2004) 115 Cal.App.4th 491, 500.)  Appellant produced evidence that the invoices were generated for accounting services.  Appellant also produced evidence the fees were reasonable.  By contrast, respondents produced evidence which showed that the accounting fees tripled between the years 2007 and 2009.  Respondents produced

10

evidence that after Turner died and Garcia left the accounting firm in 2008 the fees increased by substantial margins. Garcia, who handled respondents' account prior to leaving, billed respondents at approximately 300 hours. After Garcia left her employment with appellant, at least one of appellant's employees continued to bill respondents for approximately 300 hours. However, in 2008 and 2009, one of appellant's employees, Barron, billed respondents for 500 hours in addition to the 300 hours. Appellant did not offer any real explanation for the disparity in the charges. Rather, Warren testified that there were some new problems created because appellant hired new bookkeepers. Conflicting evidence was presented on whether the increases were warranted under the circumstances of the case. Thus, we are unable to determine that it is reasonably probable the jury would have reached a more favorable result had the information about the e-mail and the AICPA been excluded.

Moreover, we disagree with appellant that the trial court's comments in refusing to exclude the evidence require a different result. Appellant claims it was deprived of a fair trial due to judicial bias because the lower court commented that appellant violated a privilege or engaged in illegal and criminal conduct. The record does not show that appellant raised the issue of judicial bias in the trial court; therefore, the issue is waived on appeal. (*People v. Snow* (2003) 30 Cal.4th 43, 78 (*Snow*).) In addition, although the trial court erred in admitting the evidence, our review of the entire reporter's transcript does not show the trial court displayed overt bias against appellant during the trial which deprived appellant of a fair trial. We note the trial court's comments about the e-mails were not made in the jury's presence. Furthermore, appellant has not cited to any other behavior by the trial court in the jury's presence that demonstrated any judicial bias. Rather, the record shows the trial court did not disparage counsel or prevent cross-examination on any of the issues raised during the trial. The trial court also allowed appellant the opportunity to rebut inferences that there was anything amiss in sending the e-mail and in violating AICPA standards. In short, this is not a case where "'the appearance of judicial bias and unfairness colors the entire record.'" (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1008.) Appellant has not demonstrated

11

that the trial court's comments during the hearing on the motions in limine deprived him of a fair trial.  (See *Snow*, *supra*, 30 Cal.4th at pp. 78-82.)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

ASHMANN-GERST

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.